IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 OCT 26 AM 11:25

| | |
|---|---|
| MILLCRAFT-SMS SERVICES, LLC, | } |
| Plaintiff-Counterclaim Defendant, | } |
| v. | } Case No.: CV 03-P-1911-S |
| UNITED STEEL WORKERS OF AMERICA, AFL-CIO-CLC, | } |
| Defendant-Counterclaimant. | } |

ENTERED
OCT 2 6 2004

## MEMORANDUM OPINION

### I. INTRODUCTION

This is a case brought pursuant to the Labor Management Relations Act, 29 U.S.C. §§ 141 *et seq.* in which the employer, Millcraft-SMS Services, LLC ("Millcraft" or "the Company"), sued the United Steel Workers, AFL-CIO-CLC (the "Union") and moves the court to vacate an arbitrator's decision ordering reinstatement of an employee who was terminated for failing to meet a provision in the collective bargaining agreement (the "CBA" or the "contract"). The parties have each filed Motions for Summary Judgment. (Docs. #15, #17). For the reasons stated below, the court grants the motion filed by the Union (Doc. #15) and denies the motion filed by Millcraft (Doc. #17). The court also orders that Millcraft pay pre-judgment interest to the Union for the benefit of the grievant involved in the arbitration.

### II. FACTS

#### A. The Parties and Relevant Witnesses

Millcraft owns and operates a mechanical maintenance facility in Fairfield, Alabama ("the Fairfield plant"), where it repairs and refurbishes heavy equipment, such as casters and pipe mills,



for U.S. Steel and other steel companies. (First Amended Complaint ¶ 7; Answer ¶ 3). Prior to April 2002, the Fairfield plant was owned and operated by Vitalsi, Inc. ("Vitalsi"). (First Amended Complaint ¶ 7; Answer ¶ 3). The Union is the agent for the purpose of collective bargaining of Millcraft employees located at the Fairfield plant with respect to terms and conditions of employment. (First Amended Complaint ¶ 8; Answer ¶ 3).

When Millcraft purchased the assets of Vitalsi, including the Fairfield plant in April 2002, Millcraft assumed the rights and obligations under the CBA then existing between Vitalsi and the Union for persons employed within the bargaining unit at the Fairfield plant. (First Amended Complaint ¶ 9; Answer ¶ 4). In Article 12.1, the parties agreed to a broad grievance and arbitration clause which applies to "any differences . . . between the Company and the Union as to the meaning or application of the provisions of this Agreement . . . ." (Answer, Ex. 1, at 8). The "intent and purpose of this grievance policy [is] to provide for the presentation and equitable adjustment of grievances." (Answer, Ex. 1, at 8).

The grievance policy establishes a three step grievance procedure. If a grievance remains unresolved after the second step and needs "to be considered further, it shall be appealed . . . to an impartial arbitrator." (Answer, Ex. 1 at 9). Once selected, the arbitrator has the "jurisdiction and authority to interpret, apply or determine compliance with the provisions of this Agreement." *Id.* The decision of the arbitrator shall be "final and binding on the parties." *Id.*

This case particularly involves two provisions in the CBA. The first is the "just cause" section. Under the Agreement, the Company has the right to "discipline, suspend, or discharge [an] employee for *just cause*." (Answer, Ex. 1 at 8) (emphasis added). The just cause provision contains no limiting language or any definition of just cause. *Id.*

The second provision implicated is the recall notice rule. Article 26, paragraph 6 of the CBA states as follows:

> Seniority will be broken in the following circumstances:
>
> a. resignation;
> b. discharge;
> c. layoff of longer than twenty-four (24) months;
> d. retirement;
> e. the employee exceeds the time granted for leave of absence unless agreed to by mutual agreement;
> ***f. the employee does not return after being recalled from layoff within five (5) days of receipt of notice by registered mail; or***
> g. the employee does not report off for three consecutive work days unless the employee is unable to call.

(Complaint Exhibit A, Art. 26, ¶ 6, ("Art. 26.6(f)")) (emphasis added). In accordance with Art. 26.6(f), an employee who fails to return within five days of receiving the recall notice loses all of his seniority, and consequently his job. (Complaint Exhibit A, Art. 26, ¶ 6).

Johnny Snow ("Snow") worked for Millcraft as a welder at the Fairfield plant. (First Amended Complaint ¶ 10; Answer ¶ 5). During his employment with Millcraft, Snow was a member of the Union. (First Amended Complaint ¶ 11; Answer ¶ 6). During Snow's employment with Millcraft, Jim Shay ("Shay") was the Fairfield Plant Manager. (Arbitration Transcript at 25). During Snow's employment with Millcraft, J.R. Rogers ("Rogers") was the Fairfield Plant foreman. (Arbitration Transcript at 39).

### B. Snow Recalled from Layoff in April 2002 Pursuant to the Terms of the CBA

In early 2002, Snow was laid off for lack of work under the terms of the CBA. (First Amended Complaint ¶ 12; Answer ¶ 7). On Tuesday, April 16, 2002, Snow was recalled from layoff in accordance with the terms of the CBA. (First Amended Complaint ¶ 13; Answer ¶ 8). On April

17, 2002, Snow received a recall notice from Millcraft by certified mail dated April 16, 2002, instructing him to call the Company at a number provided. (Arbitration Award at 2). Snow phoned Millcraft on April 19, 2002, at the number provided on the notice.[1] He was told at that time to report for work on Monday, April 22, 2002, for the 7:00 a.m. shift. (*Id.* at 10).

### C. Snow Terminated by the Company Under the Recall Notice Provision

After Snow received his recall notice he contacted the plant and was verbally instructed to return to work on Monday, April 22, 2002, five days after his April 17, 2002 receipt of the recall notice. (Arbitration Transcript at 116, 130). On Monday, April 22, 2002, Snow called the Fairfield plant at approximately 3:10 p.m. and spoke to Nicole King, the administrative assistant. (Arbitration Transcript at 85). Snow told King that he and his wife were taking his mother-in-law to the hospital and that he was not coming to work. (Arbitration Transcript at 85). Snow also told King that he would not be returning to work until approximately April 25, 2002, several days after the required return date of April 22, 2002. (Arbitration Transcript at 87-88, 120).

In accordance with her normal procedure, King filled out a "report off slip" that reflected the telephone call from Snow. (Arbitration Transcript at 85-86, Ex. U3). On Tuesday, April 23, 2002, Snow appeared at the Fairfield plant at approximately 7:00 a.m. (Arbitration Transcript at 41). After

---

[1] The Arbitrator who heard this case found that "as he left for the hospital (where his mother-in-law had been taken after her heart attack) on Friday, April 19th [Snow] called 'work' and spoke to Administrative Assistant Nicole King, who asked him if he would be returning from layoff." (Arbitration Award at 10) (citation omitted). During this conversation Snow "advised Ms. King that he would be returning to work and would call again from the hospital." (*Id.* at 10). After having been at the hospital for some time, Snow "called from the hospital to find out when the Company wanted him to return...." (*Id.*) (citation omitted). "Ms. King put him 'on hold a couple of times trying to get management on the phone and was unable to' but then told him to return 'Monday at 7:00.'" (*Id.*) (citation omitted). The Arbitrator found that Snow told "Ms. King that he would not be able to return on Monday." (*Id.* at 10-11) (citation omitted).

4

seeing Snow, Shay and Rogers discussed the matter, determined that Snow violated the five day rule, and made the decision to terminate him. (Arbitration Transcript at 42, 110). Shay met with Rogers, Snow and union chairman Brian Wise on April 23, 2002. (Arbitration Transcript at 42-43, 109-10, 139). During that meeting, Shay informed Snow that he was being terminated for breaching Art. 26.6(f) of the CBA. (Arbitration Transcript at 43, 110).

### D.     Arbitrator Byars' Decision and Award Reinstating Snow

A dispute arose over the interpretation of the provisions of Art. 26.6(f) when the Company discharged Snow under the recall notice provision. On April 26, 2002, the Union filed a grievance alleging that Snow was "unjustly discharged." (Answer, Ex. 2). The Union pursued this grievance through the grievance process and submitted it to arbitration after the parties were unable to resolve the grievance. The parties selected Arbitrator Linda S. Byars to arbitrate the grievance.[2] Arbitrator Byars heard all the evidence presented by the parties on May 29, 2003, and post-hearing briefs were submitted by both parties. (Arbitration Award at 2). Arbitrator Byars issued her opinion on July 14, 2003, ordering that Snow be "reinstated and made whole." (*Id.* at 19).

Arbitrator Byars examined relevant provisions of the Agreement, engaged in fact-finding, and interpreted the Agreement in explaining her award. Arbitrator Byars made a number of factual findings and legal arbitral conclusions. She found that Snow phoned into work on April 19, 2002, as directed by the recall notice he received on April 17, 2002. (Arbitration Award at 10, 15). In addition, she found that Snow properly called off for Monday, April 22, 2002, the day on which the

---

[2]Arbitrator Linda S. Byars is a member of the National Academy of Arbitrators. She also appears on the rosters of the American Association of Arbitrators, the Federal Mediation and Conciliation Service and the National Mediation Board. BNA Index to vols. 101-110 at 1641 (1999).

Company contended he was scheduled to work a shift. (*Id.* at 10-11, 15). Arbitrator Byars thus implicitly concluded that Snow's phone call in to report off for his first scheduled shift constituted his "return" after layoff. Additionally, Arbitrator Byars found that even if Snow had not called off of work for Monday, April 22, 2002, the Company would have lacked just cause to discharge him because the Company denied Snow the opportunity to tell his side of the story. (Answer, Ex. 3 at 15, 19).

Without question, Arbitrator Byars recognized there were ambiguous terms in the Agreement. As she noted, "[t]he Company maintain[ed] that the word 'return' as used in Section 6(f) mean[t] that the employee who is recalled must come to the plant and be ready to work." (Answer, Ex. 3 at 5). On the other hand, the Union "maintain[ed] that Snow complied with Article 26, Paragraph 6(f) when he notified the Company..." on Friday, April 19, 2002 that he was reporting off for his Monday, April 22, 2002 shift. (Answer, Ex. 3 at 7). Arbitrator Byars found that phoning the Company and indicating an intent to return to work, while simultaneously calling off for the first scheduled shift because of family problems, constituted a sufficient return. (Arbitration Award at 13, 15). She specifically noted that the recall notice sent to Snow merely directed him to phone into work. (*Id.* at 17).

Arbitrator Byars also noted that the term 'days' in the recall provision was ambiguous. It was unclear whether 'days' as used in the recall provision meant work days, as the Union contended, or calendar days, as the Company contended." (*Id.* at 18). The Arbitrator, however, declined to resolve this ambiguity because "it was not necessary to decide this issue" in order to render her opinion. (*Id.* at 18).

Perhaps even more crucial to her ruling was the Arbitrator's finding that she "had the authority to give effect to the entire contract ...." (*Id.* at 9). Applying this principle, the Arbitrator found that because no contract provision can be read in a vacuum, the recall provision must be read against the backdrop of the contract as a whole. As she explained, "[s]ections or portions [of an agreement] cannot be isolated from the rest of the agreement and given construction independently of the purpose of the agreement...as evidence by the entire document." (*Id.* at 8) (citing Elkouri and Elkouri, *How Arbitration Works*, (5th ed. 1997)). The Arbitrator found this to be because, the "primary rule in construing a written instrument is to determine, not alone from a single word or phrase, but from the instrument as a whole, the intent of the parties." (Arbitration Award at 8). The Arbitrator then proceeded to interpret the meaning of the recall provision of Art. 26.6(f) in light of other competing provisions as well as other similar provisions in the Agreement.

The Arbitrator found that "the Parties have negotiated a standard of 'just cause' to be applied in discharge cases" (*id.* at 8), and that there was no evidence "that the Parties did not intend for the standard of just cause to apply" in the recall instance. (*Id.* at 9). Thus, "the Company is obligated to comply with the entire contract and is bound by Article 11 [the just cause provision] as well as Article 26 [the seniority provision]." (*Id.* at 8).

In addition, the Arbitrator noted that the term "days" as used in the recall provision was nowhere defined in the Agreement, and thus open to conflicting interpretations. (*Id.* at 18). She specifically noted that "[t]he Company contends that because the plant is operational seven days per week, it is reasonable to interpret the five-day rule as calendar days." (*Id.*) However, she also acknowledged that "[t]he Union contends that because [Snow] was not scheduled to work Saturday and Sunday of the week he was to return to work from layoff, it was reasonable for him to conclude

7

that his return on April 23rd was within the five days prescribed by the Agreement." (*Id.* at 18). The Arbitrator declined to decide this matter because "it is not necessary to decide this issue in order to decide the issue of just cause." (*Id.* at 18).

Arbitrator Byars made a third major finding that even were it permitted to terminate Snow's employment under the recall provision, the Company failed to discharge Snow for just cause. Having found that the "just cause" provision applies to the recall provision, the Arbitrator found that the "just cause provision entitles employees to due process, equal protection and individualized consideration of specific mitigating and aggravating factors," in all instances of discharge. (*Id.* at 9) (citing <u>The Common Law of the Workplace</u>, The Bureau of National Affairs, Inc., Washington D.C. 1998). Specifically, the Company "must investigate the circumstances before discharging an employee and make a reasonable decision guided by 'just cause'." (Arbitration Award at 17). Because the Company did not investigate Snow's circumstances <u>and</u> did not allow him to tell his side of the story before discharging him, the Company had breached its contractual obligation to discharge employees only for just cause. (*Id.* at 19).

### III.   **PROCEDURAL HISTORY**

As already noted, the CBA contains a grievance and arbitration procedure whereby any dispute as to the interpretation of application of the CBA is subject to that procedure. (Complaint Exhibit A, Article 12). Following Snow's termination, the Union filed a timely grievance on Snow's behalf, which was processed through the grievance procedure. (First Amended Complaint ¶ 17; Answer ¶ 12). The final step of the grievance procedure was arbitration before Honorable Linda S. Byars, arbitrator, on May 29, 2003. (First Amended Complaint ¶ 17; Answer ¶ 12). Article 12 of the CBA provides the grievance procedure and states that:

8

> The arbitrator shall have jurisdiction and authority to interpret, apply or determine compliance with the provisions of this Agreement, Memoranda, Supplements, etc., insofar as shall be necessary to the determination of grievances appealed to the arbitrator. The arbitrator shall not have jurisdiction or authority to add to, detract from or alter, in any way, the provisions of this Agreement, Memoranda, Supplements, etc. In discharge cases, the arbitrator will agree in advance to render a decision within thirty (30) days of the close of the record.

(Complaint Ex. A, Art. 12, ¶ 2, lines 220-24).

Arbitrator Byars' July 14, 2003 Opinion and Award ordered reinstatement and back pay for Snow on the basis that Millcraft did not have "just cause" to terminate Snow. (Complaint ¶ 19, Ex. B; Answer ¶ 14). Millcraft filed the instant action on July 25, 2003, pursuant to the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. §§ 141 *et seq.* (Complaint).

## IV. DISCUSSION

### A. The Applicable Legal Standard.

Arbitration is the decidedly favored means of resolving disputes arising under a collective bargaining agreement. *United Paperworkers v. Misco*, 484 U.S. 29, 37 (1987). Congress set forth this policy in the Labor Management Relations Act of 1947: "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement." 29 U.S.C. § 173(d).

Relying on this policy, the Supreme Court announced basic principles of deference in the judicial review of arbitration decisions in the *Steelworkers Trilogy*.[3] In *Enterprise Wheel*, the

---

[3]*United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960); *United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574 (1960); *United Steelworkers v. American Mfg. Co.* 363 U.S. 564 (1960).

Supreme Court explained that:

> [t]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. 363 U.S. at 599.

The Court held that an arbitrator's award is valid and enforceable "so long as it draws its essence from the collective bargaining agreement." 363 U.S. at 597.

These principles have been interpreted expansively and comprehensively in both subsequent Supreme Court decisions and in the Eleventh Circuit. In *Misco*, a unanimous court concluded: "Courts ... do no sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts .... [A] court should not reject an award of the ground that an arbitrator misread the contract." 484 U.S. at 38. The *Misco* Court further explained that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." 484 U.S. at 38. The Supreme Court recently affirmed this holding in *Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504 (2001) when it concluded that "[w]hen an arbitrator resolves disputes regarding the application of a contract ... the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." 532 U.S. at 509, citing *Misco*, 484 U.S. at 39.

The Eleventh Circuit interprets this standard strictly and requires that, in order to prevail, an employer seeking to vacate an arbitrator's award "must refute every reasonable basis upon which the arbitrator may have acted." *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1264

10

(11th Cir. 1996); *Sullivan, Long & Haggerty, Inc. v. Local 559*, 980 F.2d 1424, 1427 (11th Cir. 1993). Thus, the *Osram Sylvania* Court observed that an award "may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet it may not be subject to court interference." 87 F.3d at 1263 (quoting *Delta Air Lines v. Air Line Pilots Assoc.*, 861 F.2d 665, 670 (11th Cir. 1988)). "The court may not reevaluate supposed inconsistencies in the arbitrator's logic or review the merits of the arbitrator's decision ...." *Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc.*, 773 F.2d 530, 534 (3d Cir. 1985); *accord Florida Power Corp. v. Int'l Bhd. of Electrical Workers*, 847 F.2d 680, 683 (11th Cir. 1988). "A court may not vacate an arbitral award unless it is irrational, 'exceeds the scope of the arbitrator's authority' or 'fails to draw its essence from the collective bargaining agreement.'" *IMC-Agrico Co. v. Int'l Chemical Workers Council of the UFCW*, 171 F.3d 1322, 1325 (11th Cir. 1999) (quoting *Buttercrust Bakeries v. Bakery Workers Int'l Union Local 361*, 726 F.2d 698, 699 (11th Cir. 1984)).

"[T]he single most significant and common issue to which ... deference extends is the issue of what constitutes sufficient and reasonable cause for discharge." *Florida Power*, 847 F.2d at 681-82. When more than one contract provision is implicated, an arbitrator is at liberty to determine which of two competing contract provisions governs over the other. *U.S. Postal Serv. v. Nat. Ass'n of Letter Carriers*, 789 F.2d 18, 20 (D.C. Cir. 1986) (recognizing that arbitrator's conclusion as to which competing contract language "controlled '*was itself*' an interpretation of the contract which this court has no authority to disturb."); *IMC-Agrico*, 171 F.3d at 1328 ("Where there are two plausible interpretations of an agreement, then the arbitrator's choice of one over the other will be honored.").

11

B. **The Arbitration Award is Due to be Enforced.**

In its brief, the Company argues that it is entitled to summary judgment because Arbitrator Byars allegedly ignored the plain and unambiguous meaning of Art. 26.6(f), which, the Company asserts, "does not require Millcraft to consider individual circumstances before discharging an employee for" failing to return to work within five days of receiving a recall notice. (Millcraft Br. at 17) (emphasis in the original). However, the argument erroneously assumes the language of Art. 26.6(f) is plain and unambiguous. Arbitrator Byars found Art. 26.6(f) to be ambiguous and engaged in contract interpretation to ascertain its meaning. (Answer, Ex. 3 at 18).

At its core, the Company's real argument is that the court should accept its interpretation of the Contract over that of Arbitrator Byars. However, such an argument simply does not have any legal basis for overturning a labor arbitration award. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("The question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."); *United Paperworkers v. Misco*, 484 U.S. 29, 38 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."); *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1263 (11th Cir. 1996) (An award "may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet it may not be subject to court interference.").

Similarly, the Company's assertion that the Arbitration Award fails to draw its essence from the CBA because it ignores that agreement's plain language is off the mark. The Arbitrator found that Art. 26.6(f) is ambiguous on its face. She reviewed the provision's language and found that two key terms, "return" and "days"[4] are undefined and can have various meanings. Art. 26.6(f) states that, after receipt of a registered mail notice, the employee must "return," but the language contains no definition of "return." The word "return" can have various meanings including "to go or come back, as to an earlier condition or place" or "to "answer or respond." The <u>American Heritage College Dictionary</u> (4th Ed.) (2002) at 1189. Although the Company argues that the phrase "return after being recalled from layoff within five (5) days" means "physically return to the plant within five calendar days," the Arbitrator rejected that assertion. There is no legal basis for vacating the award because of that determination by the Arbitrator. Indeed, the language is simply not as plain as Millcraft claims. For example, its proffered interpretation is belied by the recall notice itself which

---

[4]Art. 26.6(f) specifies that the employee must return within "five (5) days" but it does not state whether the days are calendar days or the employee's work days, both of which are utilized in this Agreement. Article 12, "Grievance Policy" utilizes both "calendar days" and "work days." Step 1 states that the supervisor's grievance disposition must be provided "within five (5) work days," while Step 2 requires the Union to appeal within "five (5) calendar days" from receipt of that grievance disposition. (Arbitration Award at 8). Moreover, Article 15, "Vacations," utilizes "days" without specification, but the clearly-intended meaning is the employee's work days. (<u>Id.</u> at 11). The distinction is determinative because the Union argued to Arbitrator Byars that, because Grievant was not scheduled to work Saturday or Sunday, those days should not be counted for five day return purposes, rendering his return on Tuesday, April 23, timely by all accounts. (<u>Id.</u> at 18). The Arbitrator held that, in view of her determination that Grievant had met the return requirement by his telephone call on Friday, April 19, it was "not necessary to decide this issue . . . ." (<u>Id.</u> at 18). Nonetheless, this is but one more way in which the language is ambiguous.

Because there is no definition of "return" or of "days," and in light of the Company's own recall notice which merely required Snow to phone into work, Art. 26.6(f) is ambiguous. Its meaning, therefore, was for decision by Arbitrator Byars.

13

only specified that Snow phone into work at the number provided.[5] Arbitrator Byars found Snow did so.[6] (Answer, Ex. 3 at 15).

The Union references the case of *Bruce Hardwood Floors v. S. Council of Indus. Workers*, 8 F.3d 1104 (6th Cir. 1993), which the court finds instructive. As the *Bruce Hardwood Floors*' court explained: "[a]s we review the contract and the arbitration opinion, the question we thus face is whether the 'language of the contract at hand is sufficiently clear so as to deny the arbitrator the authority to interpret the agreement as he did.'" *Id.* at 1108. In that case, the court went on to hold that unless there is clear and unambiguous language requiring a different result than that reached by the arbitrator, it simply cannot be said that the arbitrator impermissibly "ignored the plain text of the collective bargaining agreement." *Id.*; *accord Norfolk & Western Ry.*, 17 F.3d at 701. In the instant case, the contract language is ___not___ clear at all, much less sufficiently clear so as to deny Arbitrator Byars authority to interpret the contract language.

---

[5]To be sure, the Arbitrator also found that the notice sent by the Company was important in addressing the recall notice issue. As the Arbitrator noted, this recall notice directed Snow to call in, and the Arbitrator found Snow complied with this requirement. (Arbitration Award at 17). Arbitrator Byers opined that had the Company meant for Snow to physically return to the plant in response to the notice, it could easily have put this in the notice. (*Id.* at 17-18). The fact that it did not bears both on meaning of the word "return" under Art. 26.6(f) as well as whether Snow did in fact "return." (*Id.* at 18).

In interpreting the term "return" in light of this notice, the Arbitrator concluded that Snow's use of the established reporting off procedures to take off his first scheduled work day after recall constituted a "return" to work. (*Id.* at 18). That the Company disagrees with her interpretation of this undefined term, is immaterial, for "[i]t is the arbitrator's construction of the collective bargaining agreement that the parties bargained for." *Enterprise Wheel & Car Corp.*, 363 U.S. at 599 (1960).

[6]On this point, it is important to highlight the fact that the Arbitrator found that the Company witnesses offered conflicting, and indeed misleading, accounts of their conversations with the Grievant (Arbitration Award at 14) - accounts designed to show that the Grievant did not comply with the terms of the recall notice to phone into work at a specified number, despite the fact that he phoned a number of time during the relevant period.

14

Nor can the court accept the Company's invitation to ignore Arbitrator Byars' factual findings. To do so would be to turn away from the well-settled legal principle that an arbitrator's fact-finding is accorded great deference. The Supreme Court reiterated the heightened deference accorded arbitral fact-finding in *Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 509 (2001), when it held that "the arbitrator's 'improvident, even silly, fact-finding' does not provide a basis for a reviewing court to refuse to enforce the award." 532 U.S. at 509 (citing *Misco*, 484 U.S. at 39).

Finally, Arbitrator Byars also engaged in a detailed analysis of the interplay between the discharge for "just cause" provision and the recall provision. Arbitrator Byars found that the Company has the right to discharge employees, but only for just cause[7] – regardless of the provision under which the Company discharges an employee. Thus, as the Arbitrator concluded, the Company may discharge employees under the recall provision provided, however, that the discharge is for just cause.

The Arbitrator found that the Company did not discharge Snow for "just cause" because it failed to afford him due process. Arbitrator Byars determined that the Company did not give Snow the opportunity to present his side of the story before discharging him. Almost immediately upon

---

[7]Indeed, Arbitrator Byars concluded, as a matter of contractual interpretation, that the "[p]arties have negotiated a standard of 'just cause' to be applied in discharge cases" (Arbitration Award at 8) regardless of which provision the Company purports to rely upon. Thus, because "the application of the [recall] language conflicts with . . . the 'just cause' provision," Arbitrator Byars found that she had "the authority to give effect to the entire contract and to apply the provisions reasonably, fairly and consistently." (*Id.* at 9). In engaging in this contract interpretation, Arbitrator Byars fulfilled her 'role' as an arbitrator, and "fashion[ed] context-driven meaning from a somewhat vague and abstract phrase, where . . . the parties' CBA does not confer on the employer the absolute right to discharge employees for certain types of conduct." *See Alabama Power Co. v. IBEW, Local 345*, 130 F. Supp. 2d 1335, 1340 (S.D Ala. 2001).

his arrival at the plant, Snow, with his union representative, met with the Plant Manager and was handed a discharge letter, purporting to discharge him under the recall provision (despite the fact that he had called off work for Monday, April 22, 2004).

### C. The Strong Federal Policy Favoring Peaceful Resolution Of Labor Disputes Through Arbitration Mandates That This Court Order Pre-Judgement Interest.

Arbitration is a cornerstone of labor peace because "it is considered as an expeditious and relatively inexpensive means of settling grievances and thus as a factor in contributing to labor peace ...." *Timken Co. v. United Steelworkers*, 492 F.2d 1178, 1180 (6th Cir. 1974). But when, as here, an employer refuses to comply with a final and binding arbitration award which, upon reasonable inquiry, clearly draws its essence from the Agreement, arbitration improperly becomes merely a prelude to expensive, time-consuming litigation. A grievant necessarily loses faith in the union because his economic survival remains in jeopardy, and he has lost wages which are due him under the labor agreement.

It is well-settled that this court has the authority to award prejudgment interest. *Payne v. Panama Canal Co.*, 607 F.2d 155, 166 (5th Cir. 1979); *Oil, Chemical & Atomic Workers Int'l Union v. American Cyanamid Co.*, 546 F.2d 1144 (5th Cir. 1977). "[T]he award of pre-judgement interest is in the discretion of the court." *American Cyanamid Co.*, 546 F.2d at 1144. Indeed, district courts have regularly awarded pre-judgement interest in arbitration enforcement cases "in light of the importance attached to the finality of grievance arbitration." *Kellogg Co. v. Pressmen Union, Local 480*, 410 F.Supp. 207, 208 (W.D. Mich. 1976); *Fortex Mfg. Co. v. Clothing Workers*, 1978 WL 14003, 99 L.R.R.M. 2303 (M.D. Ala. 1978); *Glass, Molders Int'l Union v. Owens-Illinois*, 758 F.Supp. 962, 975 (D.N.J. 1991), *aff'd*, 941 F.2d 1201 (3d Cir. 1991), *cert. denied*, 502 U.S. 1034

16

(1992); *cf.*, *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3rd Cir. 1986) (confirming that arbitration award under Federal Arbitration Act bears interest from the date of arbitrator's judgment).

An award of prejudgment interest also constitutes "an element of complete compensation." *West Virginia v. United States*, 479 U.S. 305, 310 (1987). The Fifth Circuit has held that "the only way the wronged party can be made whole is to award him interest from the time he should have received the money. At the conclusion of the dispute, the parties should be in the same position regardless of whether . . . [a party] is forced to sue . . . ." *Louisiana & Arkansas Ry. Co. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir. 1966).

This "element of compensation" is particularly important where an employee has been wrongfully discharged, as recognized by federal policies which provide for prejudgment interest on back pay awards for wrongful discharge under the National Labor Relations Act. *See NLRB v. Int'l Measurement and Control Co.*, 978 F.2d 334, 336-37 (7th Cir. 1992) (enforcing NLRB order of prejudgment interest on award of back pay to wrongfully discharged employees and concluding that the award "reimburses victims for the time value of money, the benefit of which the workers lost and the [employers] have had during the litigation.").[8]

Courts recognize the importance of compensating employees for this "time value" of an award by ordering prejudgment interest in arbitration cases involving back pay to improperly discharged workers. *Verland Found., Inc. v. United Steelworkers*, 1993 WL 388675 *7, 145

---

[8]Thus, the interest on the amount due should be the short-term federal rate used by the National Labor Relations Board in calculating interest on its back pay awards <u>New Horizons for the Retarded</u>, 283 NLRB 1173 (1987).

L.R.R.M. 2039, 2044 (W.D. Pa.1993) (interest ordered where employer refused to comply with arbitrator's award reinstating employee under a conditional reinstatement letter); *United Steelworkers v. Dayton-WaltherCorp.*, 657 F. Supp. 50, 56 (S.D. Ind. 1986) (award of interest "will serve to make him whole"); *Lucky Stores, Inc. v. Food Workers, Local 1540*, 575 F. Supp. 235, 237 n.5 (N.D. Ill. 1983) (court awarding pre-judgment interest after review of arbitration award); *Stroh Die Casting Co. v. Int'l Ass'n of Machinists, Lodge No. 10*, 553 F. Supp. 68, 70 (E.D. Wisc. 1982) (same).

## V.  CONCLUSION

The Motion for Summary Judgment filed by the Union (Doc. #15) is due to be granted and the Motion for Summary Judgment filed by Millcraft (Doc. #17) is due to be denied.

Further, the court finds that arbitration award is due to be enforced and that the Company shall make payment of prejudgment interest on the back pay amounts due from the date of Arbitrator Byars' award until the Company pays the Union, on Snow's behalf, the wages he lost. This award of pre-judgment interest will effectuate the reinstatement and make whole remedy which Arbitrator Byars has already determined to be appropriate. It will also ensure that the lost wages amount awarded is not eroded by inflation, and it will lessen the financial advantage of the Company's delay. A separate order will be entered contemporaneously herewith.

**DONE** and **ORDERED** this  25th  day of October, 2004.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE